## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **VENZA BRACKEN AND DILLON BRACKEN**, | **CIVIL NO.:** |
| *Plaintiffs* | **RE:**     Damages |
| v. | |
| **AUREO ENRIQUE RIVERA RIVERA, AND MYRTA ("MYRTITA") RIVERA VÁZQUEZ**, | |
| *Defendants* | |

## <u>COMPLAINT</u>

**TO THE HONORABLE COURT**:

    **NOW APPEARS Plaintiffs** VENZA BRACKEN and DILLON BRACKEN**,** through their undersigned attorneys, and respectfully STATES, ALLEGES, and PRAYS:

### I. INTRODUCTION

    This action seeks redress for the Defendants' intentional and wrongful conduct related to a residential Lease-Option Agreement. Specifically, Defendants knowingly misrepresented the Property's condition by concealing serious structural defects and <u>environmental hazards</u>, rendering it unsafe, uninhabitable for residential purposes and unsuitable for Bed & Breakfast purposes, and ineligible to obtain critical state tax credits for its operation.

This deliberate failure to comply with mandatory federal safety and disclosure laws, including the Minimum Property Standards (MPS) of the U.S. Department of Housing and Urban Development (HUD) and the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4852d), unlawfully obstructed Plaintiffs' ability to secure FHA financing and exercise their contractual right to purchase the Property. Plaintiffs seek full compensation for all resulting damages, including statutory treble damages, as detailed herein, as well as attorney fees.

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, specifically the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4852d), and the Minimum Property Standards promulgated under the U.S. Department of Housing and Urban Development (HUD) at 24 C.F.R. § 200.926 et seq.[1]

2. Supplemental jurisdiction over related Puerto Rico law claims (Breach of Contract, Dolo, Fraud, and Tortious Interference) exists pursuant to 28 U.S.C. § 1367, as those claims arise from a common nucleus of operative

---

[1] Although federal courts have consistently held that the mere existence of HUD regulations does not create a private right of action for damages against a lender or seller, **federal statutes and regulations can form the basis of a breach-of-contract claim if the parties have expressly incorporated them into their contract**. In *Smith v. JPMorgan Chase Bank, N.A.,* 519 Fed.Appx. 861, 864 (5th Cir. 2013), the Fifth Circuit explicitly stated this rule, finding in that instance that a general reference to "federal law" was insufficient to incorporate the Real Estate Settlement Procedures Act (RESPA) for a breach claim. However, the case establishes the principle that if a contract's terms *do* expressly incorporate federal requirements—such as FHA/HUD Minimum Property Standards or related disclosures—a subsequent violation of those standards can constitute a breach of the contract's terms, regardless of whether a separate federal private right of action exists. This supports Plaintiffs' argument that the FHA-contingency, an essential and acknowledged term, implicitly or expressly incorporated the mandatory HUD/FHA standards into the Agreement.

facts with the federal claims.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the property at issue and all relevant acts or omissions occurred within the District of Puerto Rico.

### III. PARTIES

1. Plaintiffs are residents of Puerto Rico and were the lessee and optionee of the real property located in Aguas Buenas, Puerto Rico (the "Property"). Their address is Km 0.1, Carr. 793, Aguas Buenas, PR 00727.

2. Defendant, AUREO ENRIQUE RIVERA RIVERA (the "Owner Defendant") is a residents of Puerto Rico and owner of the Property at all relevant times. Their address is Urb. Quintas de Dorado, Boulevard H-57, Dorado, Puerto Rico, 00646.

3. Defendant MYRTA ("Defendant MYRTITA") RIVERA VAZQUEZ is the daughter of Defendant Rivera Rivera who described her as his 'financial adviser' and 'named fiduciary,' **and stated that he would defer to her advice when making decisions regarding performance and financing under the Agreement.**"

### IV. FACTUAL ALLEGATIONS

1. On February 16, 2024, Plaintiffs and Owner Defendants entered into a Lease-Option Agreement (the "Agreement"), executed by Defendant Rivera Rivera, concerning the Property located in Km. 0.1, Carr. 793, Aguas Buenas, Puerto Rico.

2. Under the Agreement, Plaintiffs leased the Property with the exclusive right to purchase it within a specified term, and both parties expressly acknowledged that the contemplated purchase would be financed through an FHA-insured mortgage. Because the purchase was contingent upon FHA-insured financing, the Property was required to comply with federal safety, habitability, and structural standards as defined by HUD's Minimum Property Standards, 24 C.F.R. § 200.926 et seq., which mandate that a dwelling be safe, sound, and sanitary.

3. Owner Defendants, through Defendant Rivera Rivera, represented that the Property was suitable for residential occupancy and compliant with all applicable safety codes, despite being aware of serious structural defects that rendered the Property unsafe and uninhabitable. Article Twenty-One of the Lease and Option to Buy Agreement states as follows:

ARTICLE TWENTY-ONE: OPTION TO BUY - Landlord hereby grants Tenant and/or any legal entity or corporation created and controlled by Tenant an option to purchase the demised premises and represents, warrants and covenants to sell the demised premises to Tenant and/or any legal entity or corporation created and controlled by Tenant, under the following conditions:

[. . .]

Landlord agrees that Tenant may elect to extend the Lease agreement of the demised premises beyond the second-year extension for an additional one-year term or until Tenant can obtain financing paying the minimum down payment required under either FHA or Conventional mortgage for a four (4) unit property, whichever occurs first. Under this eventuality the purchase price will be the lesser of the newly appraised value of the demised property or the loan limit in Aguas Buenas Municipality for the type of four-unit property loan for which Tenant is approved, but in any event shall not be less than EIGHT HUNDRED TWENTY-FIVE THOUSAND DOLLARS ($825,000.00) plus the cost of construction of

structural improvements made by Tenant to the demised premises which have been specifically authorized and approved by Landlord. *(See Exhibit 1 - LEASE AND OPTION TO BUY AGREEMENT).*

4. A certified lead-based paint inspection conducted by Carlos A. Román Sánchez on January 28–31, 2025 (with a cost of $1115.00) identified multiple components containing lead-based paint above EPA/HUD regulatory thresholds, including the exterior lower walls of the single-apartment building (up to 1.80 mg/cm²), lead-containing bathroom tiles (up to 5.50 mg/cm²), lead-containing countertop tiles (up to 6.00 mg/cm²), and lead-containing fountain tiles (up to 3.30 mg/cm²). *(See Exhibit 2 - Lead-Based Paint Inspection Report).*

5. During the tenancy, Plaintiffs repeatedly sought written confirmation concerning the presence of lead-based paint and related hazards. Despite follow-ups, Defendant Rivera Rivera did not provide a written response.

6. An engineering inspection report by Ing. Eduardo Oliver Polanco and Ing. Pedro L. Torres Rigual on February 6, 2025, confirmed that the Property contained multiple structural deficiencies that made it unsafe and uninhabitable, directly violating HUD's MPS. The report documented that a 44-foot-long, 6-foot-high retaining wall adjacent to the pool area is slanted several inches toward the pool, with visible separation between columns and block sections, no rebar reinforcement, and significant hydrostatic pressure from sloped land and water seepage behind it. The same report noted water accumulation and flooding in the grassy area adjacent to the pool due to poor drainage and defective piping, creating

sanitation hazards, mosquito infestations, and unsafe conditions. The row of horse stables also exhibited humidity damage, structural stress, load failure, and evidence of soil and slope pressure, and the engineers concluded that the retaining structure behind the stables was inadequate. *(See Exhibit 3 - Report dated February 6, 2025).*

7. A subsequent engineering assessment by Ing. Pedro L. Torres Rigual on September 12, 2025, identified widespread deterioration in essential building systems—including drainage, retaining walls, fencing, roofing, electrical, and plumbing—creating ongoing safety hazards and structural risks. The engineers documented landslide activity and related damage, leaking roofs, unsafe stables, missing pool tiles, and a failed exterior paint system that allowed moisture and microbial intrusion. They cited the lending expert's conclusion that, so long as the Property fails to meet accepted safety, habitability, or performance standards it is ineligible for insurable or federally backed financing absent comprehensive structural remediation and licensed system upgrades. *(See Exhibit 4 – Report dated September 12, 2025).*

8. The engineers recommended that the pool retaining wall be completely rebuilt with proper rebar reinforcement, footings, and drainage, and that a new retaining wall be constructed behind the stables to prevent further soil pressure and water infiltration. In their later September 12, 2025 letter, they also recommended full remediation of drainage and retaining issues, repainting with mold- and algae-resistant coatings, repair of

fences, and licensed upgrades to the electrical and plumbing systems.

9.   A financing assessment issued on September 10, 2025, by a licensed mortgage loan officer determined that the Property is not eligible for FHA or Conventional financing due to material defects in violation of HUD Handbook 4000.1 and standard underwriting requirements. The assessment identified deficiencies including deteriorated and lead-based paint, unsafe electrical and plumbing systems, roof leaks, drainage failures, and structural and site safety hazards. It concluded that the Property cannot qualify for financing unless the seller completes all required repairs prior to closing, as FHA 203(b) regulations prohibit borrowers from financing or paying for the substantial FHA-required repairs needed to bring the Property up to minimum standards, and place that obligation on the seller. Accordingly, the Property is presently unfinanceable, contrary to Defendants' representations. *(See Exhibit 5 – Mortgage Broker Letter).*

10.   The FHA MPR Items Report and appraisal inspection of the Property dated September 24, 2025, independently corroborated these findings. The appraiser concluded that the Property fails to meet FHA Minimum Property Requirements ("MPRs") and is not eligible for FHA-insured financing in its present condition. The report identified that the Property consists of three deteriorated structures—one two-story building and two one-story buildings—housing four units with approximately 25%

physical depreciation. The appraisal documented the need for roof treatment, ceiling plaster repairs, overall electrical and plumbing work, repairs to glass windows and doors, and extensive painting. It also noted that the Property "lacks… adequate electrical distribution meters" for a multi-unit residential property and shows evidence of prior electrical fire damage, and required evaluation and repair by a qualified professional, underscoring the Property's non-compliance with FHA electrical safety and utility standards. *(See Exhibit 6 – FHA Appraisal Inspection Report).*

11.    Additionally, a professional microbial assessment by Melpro Unified determined that the prolonged use of bleach, followed by its abrupt discontinuation, caused accelerated bloom of mildew and algae throughout the structures. The expert explained that bleach is not an appropriate remediation method for mold or microbial growth on painted or porous surfaces and may trigger "bleach shock," a reaction that causes mold colonies to trigger rapid growth and release airborne spores, exacerbating contamination.

12.    The abovementioned report further concluded that bleach damages paint, compromises structural surfaces, and accelerates deterioration, as reflected in the cracked and failing paint observed at the Property. These findings confirm that the microbial conditions present were caused by improper and harmful cleaning methods, not ordinary wear, thereby further undermining the Property's habitability and its compliance with

FHA safety and sanitation standards which require amongst other things, that all deteriorated defective or peeling paint on pre -1978 surfaces be properly abated or otherwise replaced. *(See Exhibits 7 and 8 – Melpro Unified Reports).*

13.    Defendants were aware of these structural and safety defects well before and during the execution of the Lease-Option Agreement, but failed to disclose them to Plaintiffs.

14.    Defendants further refused to perform the repairs required under the Agreement and by HUD MPS, thereby obstructing Plaintiffs' ability to secure FHA financing and exercise the purchase option.

15.    On August 14th, 2025, the Property suffered a fire that further compromised its safety and habitability. The incident exacerbated the already-existing structural deficiencies and created additional hazards that required immediate remediation and an insurance claim process. Defendant Rivera Rivera represented to Plaintiffs that he would repair the fire-related damages and handle the corresponding insurance claim, yet he failed to undertake either obligation.

16.    Defendants' concealment of these material defects was intentional and in bad faith (*dolo*), as he knew that Plaintiffs' ability to purchase the property was contingent on meeting FHA/HUD standards.

17.    The Property was built prior to 1978 and was used for residential occupancy, classifying it as "target housing" under federal law. Defendants failed to provide the federally required lead-based paint

disclosure, EPA pamphlet, and the 10-day opportunity for inspection, in violation of the Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4852d) and 24 C.F.R. Part 35.

18.    Defendants' misrepresentations and omissions caused Plaintiffs significant financial and emotional harm, including expenses incurred in reliance on the Agreement and the loss of the contractual right to purchase the Property, and despite knowing that Plaintiffs have a child under three years old, Defendants nevertheless withheld this information.

19.    Defendants also intentionally failed to disclose that the Property was encumbered by an existing mortgage, despite knowing that such information was essential to Plaintiffs' determination of the Property's true condition and financial viability.

20.    After the Property caught fire on August 14th, 2025, Defendant Rivera Rivera further represented to Plaintiffs that he would undertake the necessary repairs and handle the corresponding insurance claim; however, Defendants have failed to perform any such repairs or pursue the insurance process, further aggravating Plaintiffs' damages.

21.    Defendant MYRTITA, actively participated in the administration, management, and decision-making process concerning the lease and sale of the Property. Acting with knowledge of the existing Agreement, she intentionally interfered with contractual relations by advising and

directing Owner Defendants to obstruct and terminate the contract, further aggravating Plaintiffs' damages.

22.    To quantify the cost of bringing the Property into basic habitability and compliance with HUD/FHA Minimum Property Standards and Minimum Property Requirements ("MPS/MPR"), Plaintiffs have obtained bids and estimates. The following are representative bids for categories of work required to cure the defects described above:

a. **Lead Abatement**

Based on the EHSS lead inspection and a professional abatement proposal, Plaintiffs have obtained a lead abatement and disposal quote of approximately $11,500.00 to remove and properly dispose of lead-based paint and lead-containing components identified on the Property, in compliance with HUD's lead-safe work practices. *(Exhibit 9 – Lead Abatement Bid.)*

b. **Exterior Paint & Roof Reseal**

In conjunction with the previous Lead Abatement paragraph, Contractor Ángel Herrera has quoted approximately $85,661.00 to pressure wash, repair, and reseal the roofs for all principal structures and to complete lead-safe exterior repainting of walls, metalwork, and exterior floors, including correction of failed paint systems documented by Plaintiffs' engineers. *(Exhibit 10 – Exterior Paint & Roof Bid.)*

c. **Retaining Walls / Structural Wallwork**

To implement the engineers' recommendation that the pool retaining wall be demolished and rebuilt with proper reinforcement and drainage, and to correct additional failing walls, Herrera's structural wallwork-estimate budgets approximately $155,366.00 for retaining wall reconstruction and related masonry repairs. *(Exhibit 11 – Wallwork Bid.)*

d. **Flatwork / Slabs & Drainage**

Ángel Herrera's flatwork proposal budgets $55,000.00 to include concrete driveway demolition and rebuild and for resurfacing/repair of exterior flatwork areas including pool, and pergola. The proposal explains that prior flatwork had been improperly installed as an overlay at insufficient thickness, concealing cracking and failing under normal wear and exposure, and recommends demolition and replacement with a minimum 2.5 inches of reinforced concrete to restore durability and safe access. *(Exhibit 12 – Flatwork Bid.)* To the extent the FHA MPR Items and HUD/FHA standards require repair, resurfacing, or replacement of additional asphalt roadway surfaces within the Property (including potholes and deteriorated sections between concrete areas), Plaintiffs will obtain and supplement with additional paving bids and estimates.

e.  **Plumbing**

A licensed plumbing contractor has quoted approximately $82,233.75 to correct substandard plumbing, including inadequate hot-water supply, defective drains, septic connections, and exposed or non-code-compliant lines identified in the FHA MPR and engineering reports. *(Exhibit 13 – Plumbing Bid.)*

f.  **Electrical**

A licensed electrical contractor has quoted approximately $19,306.61 to remediate unsafe electrical conditions at the Property, including exposed wiring, non-compliant fixtures, and repairs related to fire-damaged areas noted in the FHA MPR inspection. *(Exhibit 14 – Electrical Bid.)*

g.  **Pool Repairs**

A pool contractor has quoted $17,680.00 to restore the pool to safe and usable condition by replacing and resurfacing pool finishes and related components that are beyond their useful life, including repairs needed to address cracking, failed finishes, and related pool-system components. *(Exhibit 15 – Pool Bid.)*

h.  **Debris & Site Cleanup**

A debris-removal estimate budgets approximately $10,600.00 for demolition debris and vegetation cleanup and haul-off, including removal of excess vegetation in the pool area, needed to safely complete the above repairs. *(Exhibit 16 – Debris Cleanup Bid.)*

i. **Tile Labor & Materials (Carmen Tile)**

Carmen Tile has provided a labor quote of approximately $5,200.00 for tile removal and replacement in affected areas. Based on current tile pricing and the square footage identified in the inspection reports, Plaintiffs reasonably estimate an additional $5,200.00 for tile materials, for a combined tile budget of approximately $10,400.00. *(Exhibit 17 – Tile Bid.)*

j. **HVAC (Recreation Room AC)**

An HVAC contractor has quoted approximately $1,350.00 to repair or replace the Recreation Room air-conditioning system, which is necessary to restore basic habitability and support tourism-related use. To the extent the system is beyond its useful life or cannot be reliably repaired, replacement will be required, and Plaintiffs will supplement this estimate with an updated replacement bid. *(Exhibit 18 – AC Repair Bid.)*

k. **Fence Repair / Replacement**

Fence Repair / Replacement. A fence quote for the front fencing reflects a total net payable amount of $10,617.10. Using that $10,617.10 quote as the base scope cost and scaling to the full perimeter/interior fencing needs for the two-acre parcel (including a 40% difficulty factor for hillside segments), Plaintiffs reasonably estimate total fencing costs of $50,962.08, calculated as ($10,617.10 × 2) + ($10,617.10 × 2 × 1.4) = $50,962.08. Functional

perimeter fencing is necessary for basic safety and security, including to prevent Plaintiffs' minor child and pets from leaving the premises and to deter unauthorized entry. Portions of the perimeter fence have deteriorated and, in at least one area, were further damaged by a landslide associated with inadequate retaining structures, resulting in pet escapes. The security implications of these conditions are further described below. *(Exhibit. 19 – Fence Repair Quote.)*

I. **Total Bids**

In total, Plaintiffs' repair and remediation bids and estimates are approximately $500,059.44, exclusive of contingencies, inflation, and additional costs necessary to properly abate and replace deteriorated components in compliance with HUD/FHA standards.

23.  As a result of Defendants' breaches and other wrongful conduct alleged herein, Plaintiffs have lost economic opportunities, incurred expenses, **and suffered total damages in the amount of $1,608,012.66, which continues to accrue daily,** which includes the following itemized costs and losses shown in the accompanying financial summary:

a. **Tax Credits:** $330,000.00     (= 40% x $825,000.00)

b. **Cost of Rent :** $76,767.12

   **Through December 22, 2025**

c. **Option Fees Paid (through the date of filing):** $40,000.00

    d. **Legal:** $30,000.00

    e. **Opportunity Costs :** $228,945.28

    **Through December 22, 2025**

    f. **Repairs / Operating Costs / Bids:** $70,000.00 (reflecting extraordinary maintenance/mitigation expenses necessitated by the conditions described above)

    g. **Bids:** $500,059.44

    h. **Treble Damages for Lead: $349,057.40**

    **Through December 22, 2025**

**Treble Damages Calculation (Lead Disclosure).** The Lead Inspection Report confirms lead hazards affecting residential portions of the Property (including lead-containing bathroom wall tile in Apartment 1 and lead-based paint on exterior walls of a residential structure), as well as lead-containing components in common-use areas (including the ballroom kitchen countertop tiles and exterior fountain tiles). *(See Exhibit 2.)* For purposes of calculating statutory treble damages under 42 U.S.C. § 4852d, Plaintiffs conservatively allocate **50%** of certain reliance-based economic losses (rent paid, option fees paid, and opportunity costs) to the lead-impacted portions and common-use lead components, and seek the remaining **two-times** statutory enhancement needed to reach the treble measure **without seeking duplicative**

**recovery** of the same base amounts. Through the filing date, that calculation is:

**2 × 0.50 × ( [Cost of Rent] + [Option Fees Paid] + [Opportunity Costs] )   +   3   x   $1,115 (Lead Inspection) = $349,057.40.**

24.    In the notarial "FIRST" clause of the Lease–Option, Landlord expressly "represents, warrants and covenants" that he is the owner of record in fee simple and holds good and marketable title to the Property. *(See Exhibit 1, Lease–Option, FIRST.)* In addition, Article Nineteen, titled "WARRANTY OF TITLE," goes further and expressly covenants and warrants that Landlord is presently "seized of good marketable title to the demised premises, free of all occupancies, tenants or encumbrances," and that, at the commencement of the Lease term, the demised premises "will be free of all encumbrances or other objections to title," subject only to easements and restrictions of record that do not affect Tenant's use and occupancy. *(See Exhibit 1, Lease–Option, Art. 19.)* These provisions together constitute an express warranty that no mortgage or other encumbrance would exist against the Property at the start of the Lease–Option relationship, not merely a promise to clear title later at the time of sale.

25.    **Safety / Security Representations.** Before Plaintiffs executed the Lease–Option Agreement, Defendant Rivera Rivera represented in writing that the community was part of a "communal crime prevention system" set up by the Puerto Rico Police Department, had been "declared among

the ten best in all of Puerto Rico," and that "crime around here is very minimal" and the area is "extremely safe." *(Exhibit 20 – January 15, 2024 Email re: Safety/Crime Representations.)*

26.   Plaintiffs relied on these representations when entering the transaction. After move-in, Plaintiffs experienced a theft incident and reported it to law enforcement, and Plaintiffs raised written concerns regarding security risk and the need for perimeter fencing, security systems, and reliable power/backup power to support safe residential occupancy and basic security functions. *(Exhibit 21 – August 2024 Notice re: Crime/Security Concerns.) (Report number: 2025: 6-004: 000524, Badge #: 38185, Aguas Buenas, Police Dept.)*

27.   During Plaintiffs' tenancy, the Property was the subject of theft, and Plaintiffs filed a police report. The security risk to Plaintiffs has been compounded by the Property's deteriorated perimeter fencing and recurring electrical/power failures affecting gates, locks, cameras, and other essential security-related systems.

28.   **Extraordinary Maintenance / Mitigation.** Due to ongoing deterioration and chipping/flaking paint conditions, Plaintiffs were forced to perform extraordinary cleaning and mitigation efforts (including repeated paint-chip cleanup and related labor/supplies), diverting substantial time and incurring significant out-of-pocket expenses beyond ordinary upkeep.

29.    **Myrtita's Involvement in Performance/Financing Decisions.** On information and belief, Defendant MYRTITA—though not a signatory to the Lease–Option Agreement—participated in and exercised decision-making authority over Defendants' positions regarding financing structure and performance under the Agreement.

30.    On or about **September 3, 2024**, Defendant Rivera Rivera wrote to Plaintiffs that he had his daughter review Plaintiffs' written communication with her counsel, to advise him, described her as his "financial adviser" and "named fiduciary", and stated that he was "obviously going to follow the advice of my daughter and her lawyer" regarding how he would proceed in connection with the Agreement and transaction. *(Exhibit 22 & 23 - Communications with Aureo.)*

31.    Defendant Rivera Rivera's written communications reflect that he deferred to Defendant MYRTA ("MYRTITA") regarding key transaction decisions, including financing structure and negotiation positions, as well decision-making against the contract that lead to this Complaint.

## V. CAUSES OF ACTION

### COUNT I – Violation of the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4852d)

1.  Plaintiffs incorporate by reference all prior paragraphs.

2.  Defendants leased and offered to sell a pre-1978 residential property ("target housing") without providing the required lead-paint disclosure,

EPA pamphlet, and opportunity for inspection, as mandated by 42 U.S.C. § 4852d and 24 C.F.R. Part 35.

3. Defendants' failure constitutes a *per se* violation of 42 U.S.C. § 4852d and its implementing regulations, triggering automatic civil liability.

4. Defendant's violations were knowing, as he knew the Property was pre-1978 residential housing and nevertheless intentionally failed to provide the required lead disclosure form, EPA pamphlet, and inspection opportunity mandated by 42 U.S.C. § 4852d.

5. Plaintiffs are entitled to statutory **treble damages** for this knowing violation, in addition to attorney's fees and any other relief deemed just and proper.

### COUNT II – Breach of Contract Incorporating HUD/FHA Minimum Property Standards and Prevention Doctrine

1. Plaintiffs incorporate by reference all prior paragraphs.

2. Although federal courts have consistently held that the mere existence of HUD regulations does not create a private right of action for damages against a lender or seller, **federal statutes and regulations can form the basis of a breach-of-contract claim if the parties have expressly incorporated them into their contract**.

3. In *Smith v. JPMorgan Chase Bank, N.A.,* 519 Fed.Appx. 861, 864 (5th Cir. 2013), the Fifth Circuit explicitly stated this rule, finding in that instance that a general reference to "federal law" was insufficient to incorporate the Real Estate Settlement Procedures Act (RESPA) for a breach claim.

4. However, the case establishes the principle that if a contract's terms *do* expressly incorporate federal requirements—such as FHA/HUD Minimum Property Standards or related disclosures—a subsequent violation of those standards can constitute a breach of the contract's terms, regardless of whether a separate federal private right of action exists. This supports Plaintiffs' argument that the FHA-contingency, an essential and acknowledged term, implicitly or expressly incorporated the mandatory HUD/FHA standards into the Agreement..

5. The Agreement incorporates the HUD/FHA safety and habitability requirements as an essential term, as both parties understood the purchase would be financed under an FHA loan.

6. Defendants breached the Agreement by failing to disclose or remedy conditions that rendered the Property non-compliant with HUD standards and ineligible for FHA financing.

7. Defendants' subsequent refusal to perform the required FHA/HUD repairs prevented the satisfaction of the closing condition (FHA loan approval), thereby directly frustrating Plaintiffs' ability to exercise the purchase option.

8. Under the Prevention Doctrine of contract law, a party cannot benefit from the failure of a contractual condition if that party's own conduct (in this case, refusal to cooperate by correcting mandatory MPS defects) caused the failure, Defendants are therefore precluded from invoking the failure of the financing condition as a basis for terminating the

Agreement.

9.  As a direct result of this breach and prevention, Plaintiffs were prevented from exercising their purchase option and suffered financial losses.

10.   Defendants have also failed to remediate the fire-related damages and handle the corresponding insurance claim, as stated he would do, further breaching the contract.

**COUNT III – Dolo (Bad Faith and Fraudulent Concealment) under Puerto Rico Law**

1.  Plaintiffs incorporate by reference all prior paragraphs.

2.  Owner Defendants acted with *dolo*, intentionally concealing known structural defects and environmental hazards (including lead risks and foundation issues) with the purpose of inducing Plaintiffs to enter into the Agreement and expend funds in reliance thereon.

3.  Defendants' conduct was willful and deceitful, violating the duty of good faith inherent in all contracts under the Puerto Rico Civil Code.

4.  Defendants' concealment and refusal to repair prevented Plaintiffs from obtaining FHA financing and from executing the purchase option.

5.  As a result, Plaintiffs sustained economic damages, including the loss of the contractual rights and sums expended in reliance on the Agreement.

6.  Defendants' concealment of the existing mortgage loan and their refusal to furnish basic loan documents constitute dolo/fraudulent omission and/or breach of their contractual warranty that the Property was free of encumbrances. This concealment has diminished and clouded the value

of Plaintiffs' option interest, and exposed it to undisclosed risks of acceleration and foreclosure, including the possibility of unbargained-for "due-on-sale" or "due-on-death" enforcement by the lender.

### COUNT IV – Fraud and Misrepresentation

1. Plaintiffs incorporate by reference all prior paragraphs.

2. Defendants knowingly made false statements regarding the Property's condition, safety, and mortgage status (warranty of clear title), inducing Plaintiffs' reliance.

3. Plaintiffs reasonably relied on these misrepresentations to their detriment, incurring damages.

4. Defendants' misrepresentations and omissions include, inter alia, the written safety/crime representations made before execution *(Exhibit 20)*, the express warranty that the Property would be free of encumbrances at the commencement of the lease term *(Exhibit 1, FIRST and Art. 19)*, and the failure to provide the federally required lead-hazard disclosures and EPA pamphlet prior to leasing and offering to sell the Property *(Exhibit 2 and related paragraphs above).*

### COUNT V – Interference with Contractual Relations

1. Plaintiffs incorporate by reference all prior paragraphs.

2. Owner Defendants' daughter, Defendant MYRTITA, had knowledge of the valid and enforceable Agreement between Plaintiffs and Defendant Aureo

Enrique Rivera Rivera.

3. Acting intentionally and without justification, Defendant Myrtita interfered with the performance of said Agreement by advising and directing Defendant Rivera Rivera regarding the financing and performance positions Owner Defendants would take—including opposing self-financing and encouraging positions that obstructed performance and frustrated Plaintiffs' ability to complete the option purchase including opposing self-financing and encouraging positions that obstructed performance and frustrated Plaintiffs' ability to complete the option purchase. *(Exhibit 22–23.)*

4. Defendant Myrtita's conduct caused Plaintiffs direct economic harm, loss of contractual rights, and additional expenses.

5. Plaintiffs are entitled to damages for tortious interference with contractual relations under Puerto Rico law.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court:

1. Enter judgment in Plaintiffs' favor under each cause of action;

2. Award statutory treble damages under 42 U.S.C. § 4852d for the violation of the Residential Lead-Based Paint Hazard Reduction Act;

3. Award compensatory damages for breach of contract, fraud, *dolo*, and interference with contractual relations, and its damages arising from, consisting in the amount of $1,608,012.66, which continues to accrue

daily.

4. Award court costs, expert witness fees, and reasonable attorney's fees as authorized by 42 U.S.C. § 4852d and other applicable law;

5. Award the reasonable attorney's fees and costs incurred in enforcing the Agreement pursuant to Section 22 of the Agreement, which provides for fee-shifting.

6. Award any other relief this Court deems just and equitable.

7. Declare that the Lease and Option remain in full force and effect.

8. Declare that Defendants are barred by the Prevention Doctrine from asserting expiration, termination, or failure of any financing-related condition to the extent Defendants' own conduct—including refusal to cure FHA/HUD-disqualifying defects—prevented or materially hindered Plaintiffs' ability to obtain financing.

9. Order Defendants to immediately perform all repairs and remedial work necessary to satisfy all HUD/FHA minimum property standards for FHA-insured financing of the Property, **including remediation and repair of the August 14, 2025 fire damage and any related safety hazards**.

10. Order Defendants to restore and maintain the Property's perimeter fencing and gates in a secure condition, and to install and maintain (at Defendants' expense) an operational security/alarm system and reliable backup power sufficient to support safe residential occupancy and basic security functions

11.    Order Defendants, within thirty (30) days, to produce to Plaintiffs true and complete copies of all instruments evidencing or securing any mortgage or other encumbrance affecting the Property, including without limitation the mortgage deed, promissory note, amortization schedule, current payoff statement, any 'due on sale' or 'due on death' provisions, and all correspondence and monthly statements for the prior twelve (12) months, and to execute any authorizations reasonably required for the lender to release basic account status information (balance, payment amount, due dates, and default notices) to Plaintiffs or their counsel; and, for so long as the Lease–Option Agreement remains in effect, to provide Plaintiffs with a copy of each monthly mortgage statement within five (5) days of receipt.

12.    Further order that, in the event Defendants fail to keep any such mortgage loan current, Plaintiffs may, at their election, cure any delinquency by paying the amount due directly to the mortgagee, and that all such sums paid by Plaintiffs shall be credited dollar-for-dollar against Plaintiffs' rent and/or purchase price obligations under the Lease–Option Agreement.

**RESPECTFULLY SUBMITTED** in San Juan, Puerto Rico, on this 7th day of January 2026.

**IT IS HEREBY CERTIFIED** that on this same date the foregoing complaint was filed by uploading it to the CM/ECF system, which will send

automatic notices to the attorneys of record.

**s/Adrian Brito Rodríguez**
Adrian Brito Rodriguez
USDC/PR Bar No. 307304
Attorney for Plaintiffs
1607 Ave Ponce de Leon
St. GM6 #232
San Juan, PR
Tel. (787) 705.1011
E-mail: adrian@brito.legal